J-S01006-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| C.S., | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| L.C. | : | |
| | : | |
| | : | |
| APPEAL OF: LACKAWANNA | : | No. 1392 MDA 2017 |
| CHILDREN AND YOUTH | | |

Appeal from the Order Entered August 2, 2017
in the Court of Common Pleas of Lackawanna County,
Civil Division at No(s): 2009-FC-41245

| | | |
|---|---|---|
| IN THE INTEREST OF: C.S., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: LACKAWANNA COUNTY | : | |
| CHILDREN AND YOUTH SERVICES | : | No. 1450 MDA 2017 |

Appeal from the Order Entered August 31, 2017
in the Court of Common Pleas of Lackawanna County,
Civil Division at No(s): CP-35-DP-0000099-2017

BEFORE:  GANTMAN, P.J., MURRAY, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                 **FILED MAY 10, 2018**

In these consolidated appeals, Lackawanna County Children and Youth Services ("CYS" or "OYFS") appeals from the Order (hereinafter, the "Dependency Order") directing CYS to file a dependency petition concerning the minor male child, C.S. (hereinafter "Child" – born in March 2008), and place Child in the custody of his biological father, C.J.S. (hereinafter "Father"), under intense supervision.  CYS also appeals a subsequent Order (hereinafter, the "Withdrawal Order") allowing CYS to withdraw its dependency Petition,

and stating that Father shall have primary physical custody of Child, subject to periods of partial physical custody by Child's mother, L.C. (hereinafter "Mother").[1]  We affirm.

The trial court thoroughly set forth the factual background and procedural history underlying this appeal in its Opinion, which we incorporate as though fully set forth herein.  *See* Trial Court Opinion, 9/27/17, at 1-4, 6-14.[2, 3]

On August 2, 2017, the trial court, the Honorable Trish Corbett ("Judge Corbett" or "the trial judge"), entered the Dependency Order, and, on August 31, 2017, entered the Withdrawal Order.  CYS timely filed Notices of Appeal from both Orders, simultaneously with Concise Statements of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).  This Court thereafter consolidated the appeals.

CYS now presents the following questions for our review:

---

[1] Concerning the Withdrawal Order, the trial court explained that "this [c]ourt allowed [CYS] to withdraw the dependency [P]etition … after Father and Father's paramour completed parenting classes and continued to cooperate with [CYS].  [] [C]*hild was never adjudicated dependent*."  Trial Court Opinion, 9/27/17, at 14 (emphasis added).

[2] We will refer to the hearings that the trial court conducted on these specified dates as follows:  July 13, 2017 – hereinafter, "the shelter care hearing"; July 24, 2017 – hereinafter, "the dependency hearing"; and August 31, 2017 – hereinafter, the "adjudication hearing."

[3] Pursuant to the trial court's directive in the Dependency Order, on August 14, 2007, CYS filed a dependency Petition, in response to which the trial court scheduled the adjudication hearing.

- 2 -

1. While the [trial] [j]udge authorized the withdrawal of the Dependency Petition on August 31, 2017, whether the matter is not moot despite the withdrawal of the Dependency Petition?

2. Whether the trial judge erred and/or abused her discretion by issuing an Order in a [c]ustody matter[,] requiring [CYS] to file for dependency and to place [] [C]hild with [] Father under intense supervision?

3. Whether the [trial] judge erred by not allowing any testimony by [CYS] at the shelter care hearing, including testimony that would have made the case eligible for federal funding, to [CYS's] and [Lackawanna] [C]ounty['s] detriment[?] This must be determined at the first hearing, and cannot be addressed later, *see* 42 U.S.C. [§] 671[.]

4. Whether the trial judge erred and/or abused her discretion by conducting questioning of witnesses at the shelter care [hearing] and first adjudication hearing, instead of allowing [CYS] and other parties to call witnesses, [and] having direct and cross[-]examination by counsel, with clarification questions by the [trial] judge? [CYS] contends that this conduct was not compatible with an impartial trier of fact, as is expected of the judiciary.

5. Whether the [trial] [j]udge abused her discretion by ordering [] [C]hild removed from his home[,] in the absence of a Petition for Emergency Custody[,] and by denying [CYS's] request to withdraw the Shelter Care Petition for lack of grounds to keep temporary custody of [] [C]hild?

6. Whether the [trial] judge erred and/or abused her discretion in the … [Withdrawal] Order by not specifically addressing whether [intense] supervision (which was not defined) should be continued in the [Withdrawal] Order[,] despite [CYS] having no safety concerns[,] and by stating in the [Withdrawal] Order that "All prior Order[s] that are not inconsistent with this Order shall remain in effect,["] creating ambiguity?

Brief for Appellant at 5 (issues renumbered, some citations omitted).[4]

> In dependency matters, we review the trial court's order pursuant to an abuse of discretion standard of review. As such, we must accept the court's findings of fact and credibility determinations if they are supported by the record, but we need not accept the court's inferences or conclusions of law.

*In the Interest of H.K.*, 172 A.3d 71, 74 (Pa. Super. 2017) (citations omitted).

In its first issue, CYS contends that, contrary to the trial court's ruling, the matter of whether Child is dependent is not moot, despite the entry of the Withdrawal Order approving the withdrawal of the dependency Petition. *See* Brief for Appellant at 19-21. Specifically, pointing to one of the exceptions to the mootness rule (hereinafter referred to as "the repetition exception"), CYS asserts that "while [] [C]hild [wa]s not found dependent, he was still removed from his home by Court Order. [CYS] believes the situation would reoccur[,] and appellate review [would be] evaded[,] by no finding of dependency." *Id.* at 19 (citing *Chruby v. Dep't of Corr.*, 4 A.3d 764, 771 (Pa. Cmwlth. 2010) (stating that the repetition exception to the mootness rule is met where "the conduct complained of is capable of repetition yet likely to evade review[.]")). In support of this assertion, CYS contends that "[s]ince this appeal was filed, [CYS] learned of another order[, in a separate case, issued by a different trial court judge], ordering [CYS] to open a dependency case, do an assessment,

---

[4] We note that neither Mother/Father, nor the Guardian *Ad Litem* for Child, Corrine E. Thiel, Esquire (hereinafter, the "GAL" or "GAL Thiel"), have filed briefs in this appeal.

and provide immediate services to children by a custody order." Brief for Appellant at 19.

This Court has discussed the mootness rule and the repetition exception as follows:

> Generally, an actual claim or controversy must be present at all stages of the judicial process for the case to be actionable or reviewable. ***Plowman v. Plowman***, 409 Pa. Super. 143, 597 A.2d 701, 705 (1991). If events occur to eliminate the claim or controversy at any stage in the process, the case becomes moot. ***Id***. Even if a claim becomes moot, we may still reach its merits if the issues raised in the case are capable of repetition, yet likely to continually evade appellate review. ***Id. See also In Re Fiori***, 543 Pa. 592, 600 n. 4, 673 A.2d 905, 909 n.4 (1996) (holding death of patient did not preclude appellate review where issue was of important public interest, capable of repetition, yet apt to elude appellate review); ***Commonwealth v. Bernhardt***, 359 Pa. Super. 413, 519 A.2d 417, 420 (1986) (holding exception to mootness doctrine exists where (1) the question involved is capable of repetition but likely to evade review, or (2) the question involved is one of public importance).

***In re Duran***, 769 A.2d 497, 502 (Pa. Super. 2001) (quotation marks omitted).

The trial court addressed this matter in its Opinion and determined that CYS's claims challenging the Dependency Order (and matters related to dependency) are moot because Child was never adjudicated dependent and the Withdrawal Order permitted CYS to withdraw its dependency Petition. ***See*** Trial Court Opinion, 9/27/17, at 22-23. We agree with the trial court's analysis and determination, and thus incorporate it as though fully set forth herein. ***See id.*** Moreover, there is no merit to CYS's claim that the circumstances here meet the repetition exception to the mootness rule. While the issue may

- 5 -

be capable of repetition in the future (*i.e.*, in other cases, Lackawanna County Court of Common Pleas judges may potentially direct CYS to open a dependency case), it is not likely to continually evade appellate review, as CYS may challenge such rulings if and when they happen. **See Duran**, **supra**; **see also In re Estate of Dorone**, 502 A.2d 1271, 1274 (Pa. Super. 1985) (stating that the repetition exception is met only where the issues "capable of repetition but likely to evade review are 'substantial questions,' or 'questions of public importance.'"). Nevertheless, even though some of the claims that CYS presents in this appeal are moot, we, like the trial court, will briefly address all of its claims.

In its second issue, CYS contends that the trial judge erred by issuing the Dependency Order, purportedly in a *custody* case, which directed CYS to file for dependency and place Child with Father under intense supervision.[5] Brief for Appellant at 11-13. CYS argues that the trial judge

> abused her discretion by failing to remember that she had sought and approved both an Emergency Custody Order and a Shelter Care Order[,] putting [Child] into temporary custody of [CYS], which placed this matter under the Juvenile Act[, 42 Pa.C.S.A. § 6301 *et seq.*], and disregarded the procedures and safeguards of [the Juvenile] Act in ordering a change of custody by a [c]ustody Order.

Brief for Appellant at 12-13; **see also id.** at 12 (asserting that "[w]hen the [trial] [j]udge issued the [Dependency Order] as a [c]ustody Order, the

---

[5] CYS clarifies that it is not appealing the trial court's placement of Child with Father. **See** Brief for Appellant at 10; **see also** Rule 1925(b) Concise Statement, 9/15/17, ¶ 2.

Juvenile Act process [] existed, and nothing had been filed to bring the matter back to custody court."). In support of its claim, CYS cites this Court's decision in *Fallaro v. Yeager*, 528 A.2d 222 (Pa. Super. 1987).

In *Fallaro*, the matter was initially before the trial court on cross-petitions for custody. *Id.* at 224. However, though neither party had filed a petition for dependency, the court, *sua sponte*, made such a determination. *Id.* This Court held the trial court committed reversible error in this regard, stating that

> in order for a court to have jurisdiction to find a child to be dependent, there must be a petition filed under the Juvenile Act which alleges the dependency of the child. Since no such petition was filed in this case, the court below had no jurisdiction to find [] child to be a dependent child.

*Id.* at 225.

In its Opinion, the trial court concisely addressed CYS's claim, distinguished *Fallaro*, and determined that the Court did not err or lack jurisdiction to issue the Dependency Order, where the court did not adjudicate Child dependent prior to the filing of a dependency petition. *See* Trial Court Opinion, 9/27/17, at 16-17. We agree with the trial court's rationale and legal determination, and therefore affirm on this basis in rejecting this issue. *See id.*

In its third issue, CYS contends that Judge Corbett erred by not allowing any testimony by CYS at the shelter care hearing, including testimony that would have made the case eligible for federal funding. *See* Brief for Appellant at 13-15. CYS asserts that

[t]he sequence of events [at the shelter care hearing] shows that [] [J]udge [Corbett] did not want [CYS] to testify. [CYS's] witness(es) would have testified to the recommendation to withdraw the [shelter care] Petition. This was not what [] Judge [Corbett] wanted to hear. [CYS] submit[s] that [] [J]udge [Corbett] desired [] [C]hild to stay in temporary custody of [CYS], which meant foster care, and sought evidence from [Mother and Father] to secure that objective. This is at variance with the obligation of [] [J]udge [Corbett] to be impartial and to weigh the evidence in making a decision. In pertinent part here, that meant no testimony which would make the case eligible for federal funding, as required by 42 U.S.C. [§] 671 [(setting forth, *inter alia*, the requirements for a state plan for foster care/adoption to receive federal funding)]. The relevant portion of that statu[t]e required evidence to support a finding that reasonable efforts were made to prevent placement or that there were emergency circumstances precluding such efforts. [***See id.*** § 671(a)(15).] Judge Corbett was focused on keeping [] [C]hild in foster care, and was not focused on [CYS's] funding.

Brief for Appellant at 14 (emphasis and some citations omitted). CYS further asserts that "[t]he evidence [that CYS] had, including [] [F]ather's compliance with what [CYS] asked of him, did not support safety issues or other reasons to keep [] [C]hild out of [Father's] home. Therefore[, CYS] sought to withdraw the shelter care [P]etition and later[,] the dependency [P]etition." ***Id.*** at 15.

In her Opinion, Judge Corbett concisely addressed this claim and determined that the court did not err or abuse its discretion in the fashion in which it conducted the shelter care hearing. ***See*** Trial Court Opinion, 9/27/17, at 15-16. We agree with the trial court's analysis and determination, which is supported by the record, and therefore affirm on this basis as to this issue. ***See id.***

In its fourth issue, CYS argues that Judge Corbett abused her discretion in the fashion in which she conducted the dependency hearing,[6] which included not allowing CYS or Mother and Father an opportunity to present and question witnesses. *See* Brief for Appellant at 15-16. According to CYS,

> [b]y her actions, [] Judge [Corbett] is seeking evidence to keep [] [C]hild in custody, and not acting impartially with respect to [Mother and Father]. … By her actions in taking over the [dependency] hearing, conducting questioning [of witnesses (*i.e.*, GAL Thiel)], and finding for shelter care, without giving [CYS,] or [Mother and Father], the parties, an opportunity to testify, [] Judge [Corbett] is not acting as an impartial judge, but is focused on achieving the outcome she wants. This is not due process. This is an abuse of discretion.

*Id.* at 16.

In her Opinion, Judge Corbett concisely addressed CYS's claim, set forth the relevant law and a description of what had occurred at the dependency hearing, and opined that she committed no impropriety or abuse of discretion in conducting the dependency hearing. *See* Trial Court Opinion, 9/27/17, at 17-18. As Judge Corbett's rationale is supported by the record, and we agree with her determination, we affirm on this basis as to this issue. *See id.*

In its fifth issue, CYS contends that the trial court abused its discretion in ordering that Child be removed from the care of Father/Mother, where CYS (1) had not filed a petition for emergency custody; and (2) did not have

---

[6] Though CYS, in its corresponding issue in its Statement of Questions Presented section, purports to challenge Judge Corbett's actions at the shelter care hearing and the "first adjudication hearing," its Argument section only references the dependency hearing.

grounds to keep temporary custody of Child. *See* Brief for Appellant at 17-18. CYS asserts as follows:

> Under the Dependency Rules, a case is commenced by the filing of a [dependency] petition or emergency custody application (P[a].R.J.C.P. 1200(1)[,] (2)). Since there was an Emergency Custody Order approved by Judge Corbett, there should have been a [p]etition/application with facts averred to support the requested relief. There is no application to support the removal of [] [C]hild from a parent's home. While there is a Shelter Care Petition, (a copy of which is attached to the [Trial Court's] Opinion as Exhibit "B") …, [CYS] contends that this [P]etition cannot substitute for the lack of the earlier petition. [CYS] sought to withdraw the shelter care [P]etition because it had no basis to keep custody based on its investigation.

Brief for Appellant at 17.

The trial court addressed this claim in its Opinion and determined that the court did not abuse its discretion in this regard since (1) CYS's filing of the shelter care Petition was sufficient and warranted by the facts of record; and (2) this issue is not relevant since CYS is not appealing the shelter care requirement, but rather, the Dependency Order, which directed CYS to file a dependency petition concerning Child. *See* Trial Court Opinion, 9/27/17, at 18-22. We agree with the trial court's determination and analysis, and

therefore affirm on this basis as to this issue. *See id.*[7]

In its sixth and final issue, CYS argues that the trial judge erred insofar as the Withdrawal Order, which approved the withdrawal of the dependency Petition and stated that "[a]ll prior Order[s] that are not inconsistent with this Order shall remain in effect[,]" was ambiguous and thus cannot be enforced. *See* Brief for Appellant at 21-22. Specifically, CYS asserts that the Withdrawal Order was improperly ambiguous for failing to clarify whether the court-ordered "intense supervision" of Father's custodial time, which was ordered in the Dependency Order but not defined therein, was to be continued. *Id.* CYS poses the question, "[h]ow often are [home] visits under intens[e] supervision? Once a day, once a week, one every two weeks? It is not clear, either to [CYS], which had to guess what was meant, or to a person of reasonable understanding." *Id.*

Contrary to CYS's argument, we discern no reversible error by Judge Corbett in this regard. If CYS is confused as to the meaning of "intense

_____

[7] As an addendum, we note that the cases CYS relies upon in support of its claim are distinguishable. *See In the Interest of M.B.*, 514 A.2d 599, 602 (Pa. Super. 1986) (holding that the trial court erred in adjudicating the child dependent where no dependency petition had been filed and the matter was before the court based upon abuse allegations); *In re A.L.*, 779 A.2d 1172, 1175 (Pa. Super. 2001) (quoting *Fallaro*, *supra*, and stating that "in order for a court to have jurisdiction to find a child to be dependent, there must be a petition filed under the Juvenile Act which alleges the dependency of the child."). In the instant case, Child was never adjudicated dependent.

supervision," it may file a petition seeking clarification from the trial court.[8]

Further, at the adjudication hearing, the trial judge pointed out that Father's

custodial time would be under "intense supervision," in response to which the

attorney for CYS stated as follows:  "Yes.  And that intense supervision is

gonna remain, Your Honor."  N.T., 8/31/17, at 21.  However, the CYS attorney

did not seek clarification of this phrase at that time.  The Withdrawal Order is

enforceable and not improper due to ambiguity.

Based on the foregoing, we affirm the Dependency Order and the

Withdrawal Order.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/10/2018

_____

[8] Moreover, given Father's admission to having previously physically abused Child, as the trial court thoroughly detailed in its Opinion, we deem that the CYS supervisor was prudent in "interpret[ing] the term [intense supervision] to mean a daily caseworker visit to the home[.]"  Brief for Appellant at 21.

C⁷          S/          MAURI B. KELLY IN THE COURT OF COMMON PLEAS
      Plaintiff          LACKAWANNA COUNTY OF LACKAWANNA COUNTY

vs.                                        CIVIL ACTION – FAMILY LAW
                         CLERK OF
L      C          ,      JUDICIAL RECORDS No. 2009-FC-41245
         Defendant       FAMILY COURT DIVISION

.................................................................................................................................

## OPINION

This Court issued an Order dated August 2, 2017 regarding the custody of one minor

child in the above-referenced matter. An Appeal was filed and the opinion in support of that

Order is now ripe and as such, is addressed below on this ___ day of September, 2017.

CORBETT, J.

### I.      FACTUAL AND PROCEDURAL HISTORY

This case involves a custody dispute over one minor child, C.S. date of birth March

2008 (hereinafter "minor child"). The matter was before this Court on Custody and

Dependency.

By way of background, this case began in 2009 when C.S. (hereinafter "Father")

filed for a Petition for Custody of the minor child. Thereafter, Attorney Danielle Ross was

appointed Guardian Ad Litem (hereinafter "GAL"). (Order 09/25/09). At that time Father

and L.C. (hereinafter "Mother") had shared legal and physical custody of the minor child.

(Order 10/21/09). Allegations of abuse arose beginning in 2011 when Mother filed a

Petition for Custody.[1] Mother again raised allegations of abuse by Father against the minor

child in 2013 by filing a Petition for Emergency Special Relief, which is the next filing on

the docket.[2] At that time, the GAL was changed from Attorney Ross to Attorney Bonni

---

[1] A conciliation conference was scheduled. However, the file does not indicate what occurred at said conference.
[2] It is important for this Court to note the history of abuse allegations in this case.

1

Shelp and Mother was granted temporary physical custody of the minor child. (Orders, 05/13/13). There was a brief period of approximately two (2) months where Mother was granted primary physical custody and Father had periods of partial physical custody. (Order, 07/03/13). Thereafter in September 2013, Mother filed a Protection from Abuse (hereinafter "PFA") Order in Luzerne County. An investigation was being conducted in Luzerne County regarding allegations of abuse of the minor child by Father's paramour Monty C. (hereinafter "Father's paramour" or "Monty") presumably by Luzerne County Children and Youth Services. Subsequently, a review hearing was held in the matter. Based on those allegations, this Court granted Mother primary physical custody of the minor child and ordered Father to have no contact with the minor child until the investigation was completed. (Order, 09/17/13). In 2014, the Honorable Judge Gibbons entered a Stipulated Order wherein Father shall have supervised visits/reunification therapy with the minor child at the Children's Service Center. (Order, 02/12/14). In September 2014, Father filed a Petition for Emergency Special Relief, which was temporarily granted by the Honorable Judge Gibbons and later withdrawn by the Honorable Judge Saxton, who ordered Father to begin the aforementioned reunification therapy. (Order, 09/02/14; Order, 09/10/14).[3] In 2015, Mother again made allegations of abuse of the minor child by Father and Father was only allowed to see the minor child in a supervised setting. (Order, 06/11/15).

In December 2016, this Court appointed Attorney Corinne Thiel as the Guardian Ad Litem (hereinafter "GAL Thiel") after Father's filing of a Petition for Contempt. (Order, 12/01/16). Thereafter, this Court ordered both parties to comply

---

[3] Father averred that Mother was evicted from her residence because she was living with nine people, that Mother was selling the minor child's medication, that Mother refused to contact the supervision agency, and that the minor child was being abused.

2

with scheduling the EOTC visits with the minor child. (Order, 01/05/17). Then in June at a Guardian Ad Litem Conference, the parties entered into a Stipulated Order with GAL Thiel and agreed that Mother shall have primary physical custody subject to Father's periods of partial physical custody every other weekend. (Order, 06/16/17).

Recently, Father filed a PFA Petition and Petition for Emergency Special Relief with allegations that Mother's paramour was abusing the minor child. (PFA Petition, 06/22/17; Petition, 06/22/17).[4] Both Petitions were denied. Thereafter, Lackawanna County Office of Youth and Family Services (hereinafter "OYFS") became involved because of the minor child's allegations of safety concerns in Mother's home and Father's home. After the minor child's Children's Advocacy Center (hereinafter "CAC") interview and OYFS recommendation, the Court allowed the parties to enter into a Stipulated Order wherein Mother would have primary physical custody of the minor child subject to Father's periods of supervised partial custody to occur at EOTC or through OYFS provided that Mother's paramour have no contact with the minor child. (Order, 07/101/7).[5] Additionally this Court ordered that Father's paramour shall have no contact with the minor child. (Order 07/19/17).

OYFS took Emergency Protective Custody of the minor child on July 11, 2017 pursuant to this Court's request after Mother stated she could not take care of the minor child and this Court already determined that Father could only have supervised visits with the minor child. (Order, 07/11/17).[6] OYFS took shelter care of the minor child on July 13, 2017. (Order, 07/13/17). A dependency petition was filed, but this Court held it in abeyance

[4] These temporary petitions are usually heard by this Court with only the information from one party, however, since this Court is familiar with the long history of this case, this Court believed it was necessary to have both parties appear before considering any temporary petitions.
[5] At that time, the minor child disclosed to GAL Thiel his fear of Father, Father's paramour and Mother's paramour.
[6] Although this specific appeal is regarding the Family Court Docket, it is important for this Court to describe the history of the OYFS case as OYFS is appealing this Court requiring the agency to file a dependency.

3

at the request of OYFS to allow Mother to confirm whether she and the minor child could live with Maternal Grandmother. Thereafter, Mother came forward and stated she was moving back in with ~~1~~ *her paramour* . Since Father and his paramour were attending parenting classes and complying with OYFS, this Court allowed the minor child to be placed with Father provided that OYFS filed a dependency and place the family under intense supervision due to the long history of allegations of abuse and Father's admission thereof. (Order, 08/02/17). This Court issued two Orders on August 31, 2017. The Order under the OYFS case allowed OYFS to withdraw dependency and that Father shall have primary physical custody of the minor child subject to Mother's periods of partial on a weekly regiment among other things. (Order, 08/31/17). Under the Family Court Docket, this Court issued an Order granting Father primary physical custody subject to Mother's partial physical custody. (Order, 08/31/17).[7]

On September 1, 2017, OYFS filed a Notice of Appeal of the August 2, 2017 Order and Statement of Matters Complained of on Appeal. (Notice, 09/01/17).[8]

## II. DISCUSSION

### A. MOOT

"As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot. An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the case or due to an intervening change in the applicable law. In that case, an opinion of this Court is rendered

---

[7] Although the August 31, 2017 Orders were entered after the August 2, 2017, which is under appeal, it is important to note that the dependency was allowed to be withdrawn and therefore the issue is moot.
[8] OYFS filed two appeals in the above referenced case. However, the docket numbers and divisions are different. Therefore, this Court will address the appeals separately.

4

advisory in nature. An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect." *In re J.A.*, 107 A.3d 799, 811 (Pa. Super. 2015). In the case at hand, there is no actual case or controversy. Although a dependency petition was filed, the minor child was never adjudicated dependent and this Court allowed OYFS to withdraw the dependency.

## B.    CUSTODY/DEPENDENCY

Although OYFS is not appealing the custody provision of the August 2, 2107 Order, it is important to discuss both custody and dependency to explain this Court's Order.

"The standard of review for a trial court's decision is abuse of discretion." *Ottolini v. Barrett*, 954 A.2d 610, 612 (Pa. Super. Ct. 2008). "The fundamental consideration in any child custody case is the best interest of the child." *Ellerbe v. Hooks*, 490 Pa. 363, 416 A.2d 512 (Pa. 1980). "In determining minor child's custody, child's best interest and permanent welfare must be decided, not in relation to fixed standard, but by determining what is best for child under all circumstances." *Com. ex rel. Batturs v. Batturs*, 60 A.2d 610, 611 (Pa. Super. 1948).

Dependency requires a different approach,

The hearing judge should not ask what are the childs [sic] ['best interests] but whether the child is presently without proper care and if so whether such care is immediately available.' In child dependency matters, we must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. *In re R.W.J.*, 826 A.2d 10, 12 (Pa. Super. Ct. 2003).

"The Juvenile Act authorizes state agencies and the courts to ensure that parents meet certain legislatively determined irreducible minimum standards in executing their parental

5

rights." *In re J.W.*, 578 A.2d 952, 957–8 (Pa. Super. 1990). "Furthermore, when determining whether a parent is providing a minor with proper care and control... the caretaker's acts and omissions should weigh equally. The parental duty extends beyond mere restraint from actively abusing a child; rather, there exists a duty to protect the child from the harm that others may inflict." *In re R.W.J.*, 826 A.2d at 14 (Pa. Super. 2003).

A dependent child is defined as,

(1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk; (2) has been placed for care or adoption in violation of law; (3) has been abandoned by his parents, guardian, or other custodian; (4) is without a parent, guardian, or legal custodian; (5) while subject to compulsory school attendance is habitually and without justification truant from school; (6) has committed a specific act or acts of habitual disobedience of the reasonable and lawful commands of his parent, guardian or other custodian and who is ungovernable and found to be in need of care, treatment or supervision; (7) has committed a delinquent act or crime, other than a summary offense, while under the age of ten years; (8) has been formerly adjudicated dependent, and is under the jurisdiction of the court, subject to its conditions or placements and who commits an act which is defined as ungovernable in paragraph (6); (9) has been referred pursuant to section 6323 (relating to informal adjustment), and who commits an act which is defined as ungovernable in paragraph (6); or (10) is born to a parent whose parental rights with regard to another child have been involuntarily terminated under 23 Pa.C.S. § 2511 (relating to grounds for involuntary termination) within three years immediately preceding the date of birth of the child and conduct of the parent poses a risk to the health, safety or welfare of the child. 42 Pa.C.S.A. § 6302 (West 2017).

This Court is very familiar with the history of this case. As described above, the record is replete with allegations of Father and/or Father's paramour abusing the minor child. Mother has had primary physical custody of the minor child subject to Father's periods of <u>supervised</u> partial custody to occur at specific agencies since September 2013 to June 2017, except for a period of seven (7) days pursuant to

6

Father's filing of a Petition for Emergency Special Relief, which was temporarily granted and later withdrawn in 2014. Thereafter in June 2017, after a GAL Conference on the matter, the parties agreed without the Court's involvement that Father would increase his time from supervised visitation to periods of unsupervised partial custody every other weekend. The Monday after Father's first weekend of unsupervised custody pursuant to that custody agreement, he came to Court to file a Petition for Emergency Special Relief and a PFA Petition. Normally, this Court hears said petitions without the other side being present. However, this Court is well aware of the history of the case and believed it was necessary to hear from both parties. At that time, Father disclosed recording the minor child reporting that Mother's paramour abused him. However, this Court listened to said recording and Father's paramour was clearly interrogating the minor child and trying to get the minor child to say certain things. The minor child disclosed safety concerns with Father's residence and Mother's paramour to GAL Thiel.

This Court believed it was necessary to contact OYFS, who had the minor child interviewed that the Children's Advocacy Center (hereinafter "CAC"). After the CAC interview, Mother agreed to not let her paramour have contact with the minor child. Furthermore, Father asked GAL Thiel for supervised visitation as he felt supervision was necessary. OYFS Supervisor Megan Sporer followed up with GAL Thiel in an email stating, "Hey Corinne, Just to touch base about [Father], the stipulations to the custody should be No [sic] contact for [child] with F [Mother's Paramour]. Medication for child to be given at Mother and Father's home. [sic]. Father to attend Anger Management and Parenting. Supervised visits for father, until he has set up Anger Management and Parenting. [sic]. No Corporal Punishment [sic] to be used by any and all parties or household members. Mother needs to provide proof of her

7

Suboxone Program and screen for OYFS at their request." (See attached email marked Exhibit A). This Court believed it was in the best interest of the minor child for Mother to have primary custody provided that the minor child have no contact with Mother's paramour. This Court also determined it was in the best interest for Father to only have supervised visitation. At that time, OYFS was clearly in agreement with Father only having supervised visitation.

After the July 10, 2017 Order, OYFS was contacted because Mother claimed the minor child was not safe with her and left him with Father. Testimony came out in the OYFS Shelter Care hearing that despite this Court's standing Order that Father could only have supervised visitation with the minor child, OYFS caseworker Mindy Hughes told Father it was fine for the minor child to go home with Father and reside there. Father specifically testified,

> Now I'll be honest, now I went there Tuesday after we left here because they said we had court at 9 a.m. with you, but I wasn't sure if we had to come or not, so the mother dropped [child] off to me here. I went upstairs to CYS and spoke to Mindy and Mindy said just go home to your house, so I asked Mindy if that was okay he was with me, and she agreed to that, she came back out and said that was fine, so I took him back home to my house and I waited, but then before we got to my house, I went to the agency and I said, I'm supposed to start my first class today 10 to 12, but I have court, but I have orders from CYS to take my son to my house with me and wait there [sic]. (H.T. 07/13/17 p. 6).

OYFS clearly told Father to violate an Order of this Court. This Court is unaware of any legal authority that allows OYFS to advise parties to violate Court Orders. OYFS did not have the right to place the minor child with Father because this Court already determined that Father could only have supervised visitation.

OYFS did take Emergency Protective Custody because Father was not a placement resource and Mother admittedly could not take care of the minor child at

8

that time. (Order under DP number, 07/11/17). Despite this Court having heard the temporary Petition for Emergency Special Relief, signing the Emergency Protective Order, Order, and this Court being in contact with OYFS regarding the case, OYFS scheduled the Shelter Care hearing before the Honorable Judge Harhut. After this Court was advised that OYFS was attempting to withdraw the Shelter Care and allow Father to have custody of the minor child despite this Court's standing Order and determination that Father could only have supervised visitation with the minor child, this Court presided over the matter. At that time, this Court was not only well aware of the history of the case, but that not even a month prior, the minor child made allegations against Father and Father's paramour and Father's request to only have supervised visits at the time of the stipulated order, therefore the request to withdraw the shelter care was denied and this Court proceeded with the hearing.

During the hearing, OYFS solicitor Attorney Joseph Price (hereinafter "OYFS Attorney") stated, "July 11, I apologize that Mother has left the child in the care of father. Determination was made that father is an inappropriate caretaker based on the Court's involvement with father." (H.T. 07/13/17, p. 2). He further stated, "At this time I believe the Court has made a determination, whether or not The Court wishes to take statements from mother or father, I believe it's in The Court's discretion, however, at this time I believe The Court has determined that it would not be save [sic] for the child to be returned home to father at this time." *Id.* During that hearing this Court asked Mother, "And at that time supervised visits were ordered because [child] said that he was afraid, that he was getting hit at father's house; is that correct?" *Id.* at 4. Mother testified, "Yes." *Id.* This Court asked, "And he was afraid of his father's boyfriend as well; is that correct?" *Id.* Mother replied, "Yes." *Id.* This Court asked, "And then on July 10, of this year, you and Father entered a

9

stipulated order wherein Father will have periods of supervised physical custody through EOTC?" *Id.* Father testified, "I asked for that, Your Honor, because I didn't know with everything that had transpired . . . I asked her if it would be best since CYS [sic] was involved already, if I could get three months of Children and Youth supervised visits and then three months with the agency just so that they can see me with my son." *Id.* at 4-5. The Court, "And you felt at that time that was important for you to get these classes and everything else?" *Id.* at 5. Then Father testified that he just began his five-week parenting class with his paramour.

Later in the hearing, there was testimony that Father would have his paramour move out of the residence if the minor child could live there. OYFS Attorney stated, "And Judge, at this point, I believe he was referred to as his fiancé, which does make me question whether or not the commitment to him leaving the house is legitimate." *Id.* at 8. Also at the hearing, this Court asked "Well, you have a history of PFAS, which is one thing, there's a domestic violence issue, but you also have a history of hitting [child]." Father testified, "Yes." *Id.* at 9. The Court asked, "Isn't that true?" *Id.* Father testified, "Yes, yes." *Id.* The Court stated, "And mom says, and I applaud her coming forward if she feels that her household is unsafe right now, to say he's unsafe in my household, and I cannot as a matter of law find that he's safe in your household until you learn how to get to parent him properly. As late as last week you admitted to Corrine [sic] that you'd slap him around if he calls you a name." *Id.* Father stated, "I slap him around, I put him over my knee and spank him with an open hand and that's allowed in PA, what I was told, but CYS [sic] does not agree to that, that's what I was told. It's allow [sic] in PA. state law, by CYS [sic]

10

doesn't agree to that, that's all I ever did to [child] and that's what I admitted to Corrine [sic]." *Id.* at 9-10. The Court asked, "Well, to the point where [child] was afraid of you right?" *Id.* at 10. Mother stated, "It's really Monty." *Id.* The Court stated, "And he's afraid of Monty." *Id.* Mother stated, "And Frankie." *Id.* The Court asked, "And who's Frankie?" *i.e., Mother's former paramour* *Id.* Mother testified, "My husband. Well, it's going to be my ex-husband, but I – the reason I said it was unsafe, [child], he came to talk to me, him and my husband don't get along, so I feel like it's unsafe and I feel he's more safer [sic] with his father, but not with the boyfriend." *Id.* Further, this Court stated, "And I don't feel comfortable right now until Father has earned his stripes, do you understand?" Father replies, "Yeah I agree." *Id.* at 11. Mother stated, "And I as a mother don't want Money [sic] around my son." *Id.* The Court stated, "Well, there you go, so at this point he has to remain in sheltercare [sic] foster care – ?" *Id.* Mother asked, "But that if he after [sic] he takes his parenting class will he be able to live there?" *Id.* The Court stated, "Yes, and if you are breaking up with your fiancé, that's an entirely different story, but right now I can't do that, and in addition the fact that he's smokes pot and smokes it around him." *Id.* at 11-2. Father stated, "All right. As long as you know, he doesn't' smoke it around him, but that's what CYS –." *Id.* at 12. The Court stated, "His levels are coming down. Well, show us proof of those things and that's a different story, okay, but right now I have to find that mom under her own admission believes that he's unsafe in her home because of the husband that she's living with, and The Court has found that he was unsafe in Dad's home, therefore, a sheltercare [sic] is required and foster care is required." *Id.* The Court also stated, "Temporary until we can get – you get these things moving and changed and I see change – it is never my object to keep children away from their parents, you know, I want you to be involved. We've long since decided, Mother,

11

that you are a good mother, okay? It's not done. And let us see what the story is with Monty, and if he shows something different to CYS, then that changes the circumstances." *Id.* Shelter care was granted. As stated above, OYFS first wanted to withdraw shelter care then clearly stated that Father refers to his paramour as his fiancé and OYFS does not believe Father is being honest with having his paramour leave the residence. It is clear from the testimony that not only was shelter care warranted, but that both parties agreed with shelter care despite OYFS not wanting to provide safe shelter for the minor child.

At the dependency hearing on July 24, 2017, this Court held off on adjudicating the minor child dependent and placed the minor child with Mother after she testified that she would move out of her residence and keep the minor child away from her husband. *i.e., Mother's paramour* Mother then came forward in August of 2017 and stated that she was moving back in with her paramour. At that time, Father and Father's paramour had attended more than two parenting classes and were cooperating with OYFS. Therefore, this Court felt comfortable placing the minor child with Father under the condition that OYFS file a dependency and place Father under intense supervision. This Court believed a dependency petition was warranted because the minor child was without proper parental care or control, which was based on the evidence that Mother could not care for the minor child because she determined the minor child was not safe around her paramour and Father's history of abusing the minor child by admission. This is verified by testimony at the July 24, 2017 hearing. GAL Thiel testified, "From the beginning of this case this whole – the whole [sic] issue has always been parent/child conflict with dad and minor child." (H.T. 07/24/17, p. 16).

12

GAL Thiel also testified, "Correct, father [sic] has always been consistent with me regarding his father. It has always been a strained relationship, I like father, we have a great working relationship, he's very forthright, he acknowledges that he uses corporal punishment, that he has difficult with [child's] behavior, as well as mom does." *Id.* at 19. Furthermore GAL Thiel testified, "He [Father] talked openly about using corporal punishment and slapping him in the face when he says derogatory names and statements to dad regarding his relationship with another male. I think that's a point of contention between the two, so that has always been consistent since I've been involved. [Child] has always wanted to be with mom, and we were working on his relationship with father." *Id.* at 19-20. GAL Thiel stated,

> Well, if I'm asked for a recommendation, my recommendation is that I just don't understand how we can go from June 22, a recommendation of dad being supervised and there's issues in the home after a CAC interview and then a few days later mom says I can't take care of the child and we're going to relinquish custody back to the dad, when that was the initial referral. To me, that is more of a matter of convenience than rather a matter of protection and safety, and I do have concerns. There are a lot of issues that we need to work on between father and child, and my job is to – well, all our job [sic] is to do what's best and maintain safety. I don't think there's been enough work or enough services at all in this case to work on the issues between dad and child. *Id.* at 22.

Additionally, caseworker Mindy Hughes testified at the August 31, 2017 hearing that there were ongoing concerns with Mother and Father and they were concerned with Father's parenting and inappropriate discipline. Based on the history of the case, the testimony at the hearings, and the evidence before the Court, this Court believes this fits under the definition of dependency and gave OYFS grounds to file a dependency petition. Furthermore, OYFS Attorney stated at the Dependency Hearing on July 24, 2017 after questions whether the grandparents could take kinship care of the minor child and OYFS Attorney stated, "They both have, Your Honor, and for various reasons; namely, that they are also referred to for improper discipline; they were deemed inappropriate." (H.T. 07/24/17, p. 10). This Court is

13

unclear how the minor child cannot be placed with either grandmother because of inappropriate discipline, but can be placed with Father who has a history of abusing the minor child. OYFS either has to protect the minor child to the full extent possible or not. This Court was not comfortable placing the minor child with Father until he proved himself. As previously stated, "When determining whether a parent is providing a minor with proper care and control... the caretaker's acts and omissions should weigh equally. The parental duty extends beyond mere restraint from actively abusing a child; rather, there exists a duty to protect the child from the harm that others may inflict." *In re R.W.J.*, 826 A.2d at 14 (Pa. Super. 2003). Clearly, neither parent was providing proper care and control in this case.

In addition, this Court allowed OYFS to withdraw the dependency petition on August 31, 2017 after Father and Father's paramour completed parenting classes and continued to cooperate with OYFS. The minor child was never adjudicated dependent.

Furthermore, on June 2, 2017, this Court had a meeting with the Honorable Judge Jarbola, Director of OYFS Bill Browning (hereinafter "Director Browning"), Assistant Director of OYFS Carrie Browning (hereinafter "Assistant Director Browning") and Chief of Juvenile Probation Rich Clifford regarding dependency actions. At that time, Director Browning and Assistant Director Browning told the Court to contact OYFS to file a dependency petition if the Court believes it is "necessary" and OYFS will follow through with the dependency. However, when this Court requested a dependency to be filed, OYFS stated to the Court that there are no grounds. The Court replied that the minor child is homeless. Mother states her home is unsafe and this Court has determined Father's custody had to be supervised by someone other than the person with whom he lived.

14

Therefore, OYFS' position as to grounds for dependency was invalid and in fact directed Father to violate this Court's Custody Order.

For the foregoing reasons, the Order of Court dated August 2, 2017 should be affirmed.

## III. MATTERS COMPLAINED OF ON APPEAL

OYFS filed a Concise Statement of Matters Complained of on Appeal on or about September 1, 2017, which are listed below and addressed in turn.

A. The trial judge [sic] erred by not allowing any testimony by the agency at the shelter care hearing, including testimony that would have made the case eligible for federal funding, to the agency's and county's detriment. This must be determined at the first hearing, and cannot be addressed later. See 42 U.S.C. 671. [sic]

This clearly shows the motivation behind this appeal. The federal funding for the agency is clearly more important than the safety and welfare of this minor child. OYFS did not even want to proceed with the Shelter Care hearing, they sought to withdraw the Shelter Care before a different judge knowing that this Court was fully involved in the case.

Additionally, OYFS Attorney was clearly involved in the Shelter Care hearing and participated numerous times. During the hearing, OYFS Attorney stated, "July 11, I apologize that Mother has left the child in the care of father. Determination was made that father is an inappropriate caretaker based on the Court's involvement with father." (H.T. 07/13/17, p. 2). He further stated, "At this time I believe the Court has made a determination, whether or not The Court wishes to take statements from

15

mother or father, I believe it's in The Court's discretion, however, at this time I believe The Court has determined that it would not be save [sic] for the child to be returned home to father at this time." *Id.* This Court is not required to advise the attorneys on how to proceed in a case or require that the case be eligible for funding. If OYFS had questions of the witnesses or wished to call witnesses in the case, OYFS attorney should have requested to call witnesses during the hearing.

Lastly, this issue is not relevant because OYFS is only appealing the August 2, 2017 Order, which has no requirement for shelter care and is only appealing the requirement of filing a dependency.

For the foregoing reasons, the Order of Court dated August 2, 2017 should be affirmed.

B. The trial judge [sic] erred/and or [sic] abused her discretion by issuing an Order in a custody matter requiring the agency to file for dependency and place the child with the father under intense supervision. See <u>Fallaro v. Yeager</u>, 364 PA. Super. 408, 528 A.2d 222 (PA. Super. 1986).

"The Courts must adhere to the procedures developed for resolution of various problems which arise concerning the welfare of children. Absent a dependency petition, the court is without jurisdiction to make a determination." *Fallaro v. Yeager*, 528 A.2d 222, 230 (Pa. Super. 1987). The Court did not determine the minor child was dependent before a dependency petition was even filed, as the lower court did in *Fallaro v. Yeager*. Rather, this Court ordered OYFS to file a dependency without placing the minor child in foster care because this Court was concerned with the long history of allegations of abuse of the minor child by

16

Father. This Court is well aware of the due process requirements for dependency litigation.

Furthermore as stated directly on OYFS's website, "Lackawanna County Office of Youth and Family Services Will ensure child safety and family stability while respecting the rights and dignity of the family group." Lackawanna County Website (2017) available at http://www.lackawannacounty.org/index.php/departmentsagencies/human-services/children-and-youth-services. It is OYFS's duty to ensure minor children are safe. The Court was requiring that in this matter.

For the foregoing reasons, the Order of Court dated August 2, 2017 should be affirmed.

C. The trial judge [sic] erred and/or abused her discretion by conducting questioning of witnesses at the shelter care and first adjudication hearing, instead of allowing the agency and other parties to call witnesses, having direct and cross-examination by counsel, with clarification questions by the judge. [sic]. The conduct was not compatible with an impartial trier of fact, as is expected of the judiciary.

Under Pennsylvania Rule of Evidence 614,

(a) Calling. Consistent with its function as an impartial arbiter, the court, with notice to the parties, may call a witness on its own or at a party's request. Each party is entitled to cross-examine the witness. (b) Examining. Where the interest of justice so requires, the court may examine a witness regardless of who calls the witness. (c) Objections. A party may object to the court's calling or examining a witness when given notice that the witness will be called or when the witness is examined. When requested to do so, the court must give the objecting party an opportunity to make objections out of the presence of the jury."Pa.R.E., Rule 614 (West 2017).

17

A review of the July 24, 2017 transcript will show that the attorneys for the minor child and the parents were questioning this Court about the case because they were not made aware of facts by OYFS. This Court was not going to testify about the facts of the case, therefore GAL Thiel testified about her knowledge of the case. OYFS had a full opportunity to cross examine the witness. No objections were made by OYFS Attorney. Furthermore, the OYFS Attorney did not request to call any witnesses at the time of the hearing despite fully participating in the hearing. This Court cannot advise OYFS attorney that the agency should be calling witnesses. An error committed by OYFS is not an error by the Court.

Furthermore, this issue is not relevant because OYFS is not appealing this dependency proceeding and the minor child was never time adjudicated dependent. Rather, OYFS is appealing the requirement of a dependency petition being filed on August 2, 2017.

For the foregoing reasons, the Order of Court dated August 2, 2017 should be affirmed.

D. The child was removed from his home by the Judge's order, without a Petition for Emergency Custody by the Agency, which had no grounds for such removal. The agency sought to withdraw the Shelter Care Petition, which the judge [sic] denied. This raises due process issues, as well as abuse of discretion issues with respect to the judge's [sic] actions. Whether the Judge abused her discretion by ordering the child removed from his home in absence of a Petition for Emergency Custody and by denying the agency's request to withdraw the

18

Shelter Care Petition for lack of grounds to keep temporary custody of the child?

A review of the file shows that OYFS's Petition for Emergency Custody is filed under Docket Number DP-99-2017 on July 12, 2017, which is attached hereto and marked Exhibit B. Therefore, this issue is a complete and utter misrepresentation of the facts.

This Court is not required to follow every request by OYFS, especially when the minor child would clearly be unsafe in Father's residence. As previously discussed, not even a month prior, the minor child made allegations against Father and Father's paramour and Father's request to only have supervised visits at the time of the stipulated order, therefore the request to withdraw the shelter care was denied. During the hearing, OYFS Attorney stated, "July 11, I apologize that Mother has left the child in the care of father. Determination was made that father is an inappropriate caretaker based on the Court's involvement with father." (H.T. 07/13/17, p. 2). He further stated, "At this time I believe the Court has made a determination, whether or not The Court wishes to take statements from mother or father, I believe it's in The Court's discretion, however, at this time I believe The Court has determined that it would not be save [sic] for the child to be returned home to father at this time." *Id.* During that hearing this Court asked Mother, "And at that time supervised visits were ordered because [child] said that he was afraid, that he was getting hit at father's house; is that correct?" *Id.* at 4. Mother testified, "Yes." *Id.* This Court asked, "And he was afraid of his father's boyfriend as well; is that correct?" *Id.* Mother replied, "Yes." *Id.* This Court asked, "And then on July 10, of this year, you

19

and Father, entered a stipulated order wherein Father will have periods of supervised physical custody through EOTC?" *Id.* Father testified, "I asked for that, Your Honor, because I didn't know with everything that had transpired . . . I asked her if it would be best since CYS [sic] was involved already, if I could get three months of Children and Youth supervised visits and then three months with the agency just so that they can see me with my son." *Id.* at 4-5. The Court, "And you felt at that time that was important for you to get these classes and everything else?" *Id.* at 5. Later Father testified that he just began his five-week parenting class with his paramour. Later in the hearing, there was testimony that Father would have his paramour move out of the residence if the minor child could live there. OYFS Attorney stated, "And Judge, at this point, I believe he was referred to as his fiancé, which does make me question whether or not the commitment to him leaving the house is legitimate." *Id.* at 8. Also at the hearing, this Court asked "Well, you have a history of PFAS, which is one thing, there's a domestic violence issue, but you also have a history of hitting [child]." Father testified, "Yes." *Id.* at 9. The Court asked, "Isn't that true?" *Id.* Father testified, "Yes, yes." *Id.* The Court stated, "And mom says, and I applaud her coming forward if she feels that her household is unsafe right now, to say he's unsafe in my household, and I cannot as a matter of law find that he's safe in your household until you learn how to get to parent him properly. As late as last week you admitted to Corrine [sic] that you'd slap him around if he calls you a name." *Id.* Father stated, "I slap him around, I put him over my knee and spank him with an open hand and that's allowed in PA, what I was told, but CYS [sic] does not agree to that, that's what I was told. It's allow [sic] in PA state law, by CYS [sic]

20

doesn't agree to that, that's all I ever did to [child] and that's what I admitted to Corrine [sic]." *Id.* at 9-10. The Court asked, "Well, to the point where [child] was afraid of you right?" *Id.* at 10. Mother stated, "It's really Monty." *Id.* The Court stated, "And he's afraid of Monty." *Id.* Mother stated, "And Frankie." *Id.* The Court asked, "And who's Frankie?" *Id.* Mother testified, "My husband. Well, it's going to be my ex-husband, but I – the reason I said it was unsafe, [child], he came to talk to me, him and my husband don't get along, so I feel like it's unsafe and I feel he's more safer [sic] with his father, but not with the boyfriend." *Id.* Further, this Court stated, "And I don't feel comfortable right now until Father has earned his stripes, do you understand?" Father replies, "Yeah I agree." *Id.* at 11. Mother stated, "And I as a mother don't want Money [sic] around my son." *Id.* The Court stated, "Well, there you go, so at this point he has to remain in sheltercare [sic] foster care --?" *Id.* Mother asked, "But that if he after [sic] he takes his parenting class will he be able to live there?" *Id.* The Court stated, "Yes, and if you are breaking up with your fiancé, that's an entirely different story, but right now I can't do that, and in addition the fact that he's smokes pot and smokes it around him." *Id.* at 11-2. Father stated, "All right. As long as you know, he doesn't' smoke it around him, but that's what CYS --." *Id.* at 12. The Court stated, "His levels are coming down. Well, show us proof of those things and that's a different story, okay, but right now I have to find that mom under he own admission believes that he's unsafe in her home because of the husband that she's living with, and The Court has found that he was unsafe in Dad's home, therefore, a sheltercare [sic] is required and foster care is required." *Id.* The Court also stated, "Temporary until we can get – you get these things moving and changed

21

and I see change — it is never my object to keep children away from their parents, you know, I want you to be involved. We've long since decided, **Mother** that you are a good mother, okay? It's not done. And let us see what the story is with Monty, and if he shows something different to CYS, then that changes the circumstances." *Id.* Shelter care was granted. As stated above, OYFS first wanted to withdraw shelter care then clearly stated that Father refers to his paramour as his fiancé and OYFS does not believe Father is being honest with having his paramour leave the residence. It is clear from the testimony that not only was shelter care warranted, but that both parties agreed with shelter care despite OYFS not wanting to provide safe shelter for the minor child. OYFS' statement that there were no grounds for shelter care is not supported by the record.

Furthermore, this issue is not relevant. OYFS is not appealing the shelter care requirement. OYFS is only appealing the requirement that a dependency be filed under the August 2, 2017 Order.

For the foregoing reasons, the Order of Court dated August 2, 2017 should be affirmed.

E. While the judge [sic] authorized the withdrawal of the Dependency petition [sic] on August 31, 2017, the issue is not moot because the agency believes the situation will reoccur and escape review. Whether the matter is not moot despite the withdrawal of the Dependency Petition?

"As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot. An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the

22

case or due to an intervening change in the applicable law. In that case, an opinion of this Court is rendered advisory in nature. An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect." *In re J.A.*, 107 A.3d 799, 811 (Pa. Super. 2015). In the case at hand, there is no actual case or controversy. Although a dependency petition was filed, the minor child was never adjudicated dependent and this Court allowed OYFS to withdraw the dependency. OYFS cannot base an appeal on something that may happen in the future.

Furthermore, on June 2, 2017, this Court had a meeting with the Honorable Judge Jarbola, Director Browning, Assistant Director Browning and Chief of Juvenile Probation Rich Clifford regarding dependency actions. At that time, Director Browning and Assistant Director Browning suggested that the Court contact OYFS to file a dependency if the Court believes it is necessary and OYFS will follow through with the dependency. However, when this Court requested a dependency to be filed, OYFS stated to the Court that there are no grounds. The Court replied that the minor child is homeless. Mother states her home is unsafe and this Court has determined Father's custody had to be supervised by someone other than the person with whom he lived. Now for OYFS to say that this situation will reoccur and escape review is irrational, because this Court was doing exactly what both Director Browning and Assistant Director Browning suggested the Court to do if it felt OYFS involvement was necessary.

For the foregoing reasons, the Order of Court dated August 2, 2017 should be affirmed.

23

IV.    CONCLUSION

*order*

Based on the foregoing this Court has issued the August 2, 2017 placing the minor child with Father and requiring OYFS to file a dependency and place Father under intense supervision.

BY THIS COURT:

_____ J.
TRISH CORBETT